# The Effect of an Appropriations Rider on the Authority of the Justice Department to File a Supreme Court Amicus Brief

A rider in the 1990 appropriations legislation for the Justice Department, the Federal Communications Commission, and other agencies that provides that no funds appropriated by that legislation may be used to repeal, modify, or reexamine certain FCC policies does not forbid the Justice Department from filing a Supreme Court amicus brief in a case in which those policies are at issue.

Febrary 5, 1990

MEMORANDUM OPINION FOR THE ACTING SOLICITOR GENERAL

This responds to your request for our opinion on whether a rider in the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990 ("1990 Appropriations Act"), Pub. L. No. 101-162, 103 Stat. 988 (1989) forbids the Department of Justice from filing an amicus brief with the Supreme Court in *Metro Broadcasting, Inc. v. FCC*, No. 89-453, and *Astroline Communications Co. v. Shurberg Broadcasting*, No. 89-700.[1] For the reasons discussed below, we agree with your conclusion that the rider does not forbid such a filing.

## I. Background

The 1990 Appropriations Act provides funding for several federal government entities, including the Department of Justice (title II), the Judiciary (title IV), and a variety of agencies, among them the Federal Communications Commission (title V). A rider appears in the provision of title V making appropriations for the Federal Communications Commission ("FCC"), which is also found in materially the same language in the two prior annual appropriations acts.[2] It reads:

---

[1] *See* Memorandum for William P. Barr, Assistant Attorney General, Office of Legal Counsel, from John G. Roberts, Jr., Acting Solicitor General, *Re: Use of Departmental Appropriations to File Briefs Amicus Curiae in Metro Broadcasting, Inc. v. FCC, No. 89-453 and Astroline Comm. Co. v. Shurberg Broadcasting, No. 89-700* (Jan. 11, 1990) ("Roberts Memorandum").

[2] The original provision from which the current rider is derived appears in Pub. L. No. 100-202, 101 Stat. 1329-1, 1329-31 (1987). *See also* Pub. L. No. 100-459, 102 Stat. 2186, 2216-17 (1988).

13

[N]one of the funds appropriated by this Act shall be used to repeal, to retroactively apply changes in, or to continue a re-examination of, the policies of the Federal Communications Commission with respect to comparative licensing, distress sales and tax certificates granted under 26 U.S.C. 1071, to expand minority and women ownership of broadcasting licenses . . . other than to close MM Docket No. 86-484 . . . .

103 Stat. at 1020.

No such rider appears in title II, which appropriates funds for the Justice Department, not even in the "General Provisions" of that title. 103 Stat. at 995-1006.[3] Nor does any such rider appear in title IV, which appropriates monies for the federal courts, including the Supreme Court. *Id.* at 1010-16. Finally, no such rider appears in title VI ("General Provisions"), which sets forth general restrictions on the use of the funds appropriated under all of the preceding titles of the Act. *Id.* at 1031-40.

The questions of the FCC rider's possible application to a Justice Department amicus filing initially arose in August 1988, when the Civil Rights Division sought permission to file an amicus brief with the Court of Appeals for the District of Columbia Circuit in what is now the *Metro Broadcasting* case.[4] Both the Civil Rights Division and the Solicitor General concluded, as do we here, that the rider does not prohibit amicus filings by the Department. The Solicitor General authorized Civil Rights to file an informational amicus brief with the court of appeals,[5] and such a brief was in fact filed.[6]

## II. Analysis

The FCC rider prohibits the use of "funds appropriated by this Act . . . to repeal, to retroactively apply changes in, or to continue a reexamination of, the [specified] policies of the Federal Communications Commission." 103 Stat. at 1021. It is clear from the language and purpose of the rider, and from the overall structure of the 1990 Appropriations Act, that the rider was

---

[3] The "General Provisions" of title II do otherwise impose restrictions on the use of Justice Department funds. *See* 1990 Appropriations Act §§ 205-206, 103 Stat. at 1005 (restrictions on abortion-related use of funds).

[4] *See* Memorandum for the Solicitor General, from William Bradford Reynolds, Assistant Attorney General, Civil Divison, *Re: Steele v. FCC and Winter Park Communications, Inc. v. FCC, Nos. 84-1176 & 85-1755 (D.C. Cir.)* (July 22, 1988) (rider did not prohibit amicus filing in court of appeals); handwritten comments of the Solicitor General on Memorandum for the Solicitor General, from Thomas W. Merrill, Deputy Solicitor General, *Re: Steele v. FCC* (Aug. 3, 1988) (rider did not prohibit filing of an "informational" amicus brief).

[5] In his handwritten marginal comments authorizing a filing, the Solicitor General wrote that "[t]he argument relating to the appropriations rider is troublesome but I think Civil Rights has the better of it." He further observed that a purely "informational" filing would not "come within ten miles of the appropriation rider's prohibition (even on its most expansive interpretation)."

[6] *See Brief for the United States as Amicus Curiae, Winter Park Comm., Inc. v. FCC & Metro Broadcasting, Inc. v FCC,* D.C. Cir. Nos. 85-1755 & 85-1756 (Aug. 29, 1988).

14

intended to impose restrictions only on the FCC, and thus does not forbid the filing of an amicus (or any other) brief by the Department of Justice. Even if this conclusion were less than clear, we would resolve any ambiguity in favor of this construction to avoid the very serious constitutional problems that would exist were the rider interpreted to prevent the Department from filing in the Court.

The 1990 Appropriations Act is essentially an omnibus enactment comprising a number of separate and unrelated appropriations "Acts" (titles I-V), and a number of general provisions that apply to all titles of the Act (title VI). Each of titles I-IV is expressly designated an "Act." *Id.* at 995, 1006, 1010, 1016. For example, title II, which appropriates funds for the Justice Department, provides that title II "may be cited as the 'Department of Justice Appropriations Act, 1990.'" *Id.* at 1006.[7] With the exception of title VI, which for understandable reasons Congress might not separately designate an "Act," title V is the only title that is not expressly designated an Act. Because it is not designated an "Act," there is some question as to whether the term "this Act" in title V was intended to refer only to title V or to the entire 1990 Appropriations Act.

We believe that title V also should be considered a separate act for the purpose of construing the provisions within that title, which appears to be the only purpose for Congress' separate designation of titles I-IV as "Acts." We can think of no substantive reason why Congress would have wanted title V treated any differently in this respect from titles I-IV. Indeed, it appears that the only reason title V may not have been designated an "Act" is that, unlike titles I-IV, it appropriates monies to a number of different federal government entities[8] and, as a consequence, would not have been easily entitled. It follows from the fact that title V was intended to be understood as a separate "Act" for the same purposes that titles I-IV are to be so understood that the term "this Act" in the title refers only to title V, not to the entire 1990 Appropriations Act.[9] Accordingly, we conclude that the expenditure restriction in the rider applies only to the FCC appropriations made in title V.[10]

Interpreting the rider as applicable only to the FCC is the interpretation

---

[7] The Act provides that title I "may be cited as the 'Department of Commerce Appropriations Act, 1990'", *see* 103 Stat. at 995; that title III "may be cited as the 'Department of State Appropriations Act, 1990',"  *id.* at 1010; and that title IV "may be cited as 'The Judiciary Appropriations Act, 1990'," *id.* at 1016.

[8] Each of titles I-IV appropriates monies for a single agency or, in the case of title IV, an entire branch of government (the federal judiciary).

[9] This interpretation of the term is consistent with the other uses of the term in title V. *See* 103 Stat. at 1018 (Commission on the Bicentennial of the United States Constitution); *id.* at 1022 (Securities and Exchange Commission); *id.* at 1023 (Small Business Administration); *id.* at 1024 (same); *id.* at 1028 (same).

[10] The restriction would apply to, although presumably have no practical effect on, the other agencies for which appropriations are made in title V.

most consistent with the rider's character as a proviso. Sums are appropriated "[f]or necessary expenses of the Federal Communications Commission . . . *Provided*" that the rider's terms are observed. 103 Stat. at 1020. While it would be possible to read the provision as conditioning the FCC appropriations on Commerce, Justice, State and other agency compliance with the terms of the rider, clearly the most natural reading of the proviso is as a condition only on the immediately preceding appropriation to the FCC. It would be odd indeed for Congress to condition one agency's appropriations on compliance by other agencies with enacted prohibitions. This is especially the case where, as here, the other agencies have no apparent authority to engage in the prohibited activities.

The legislative history confirms that Congress intended the rider to apply only to the FCC. The Senate Report on the bill that first included the rider explains the purpose of the rider as follows:

> The Committee has inserted a provision in the bill which bars *the Federal Communications Commission* from expending funds to repeal, retroactively restrict, or continue a pending reexamination of, longstanding rules to promote the ownership of broadcasting licenses by minority group members and women. The FCC has commenced an inquiry, In the Matter of Reexamination of the Commission's Comparative Licensing, Distress Sales and Tax Certificate Policies Premised on Racial, Ethnic or Gender Classifications, MM Docket No. 86-484, which calls into question the advisability and legality of these rules.
>
> The Committee believes the inquiry is unwarranted . . . .

S. Rep. No. 182, 100th Cong., 1st Sess. 76 (1987) (emphasis added) ("Senate Report"). The report continues with instructions *to the FCC* to close MM Docket No. 86-484, and to resolve within sixty days certain proceedings that had been either remanded by the District of Columbia Circuit Court of Appeals — including the *Shurberg* case — or held in abeyance pending the outcome of the FCC's rulemaking, "in a manner consistent with the policies that mandated incentives for minorities and women in broadcast ownership." *Id.* at 77.

These passages make clear that the purpose of the rider was to prevent the FCC from using its appropriated funds to continue the then-pending FCC administrative proceeding reexamining the minority and gender preference policies[11] or, at most, to prevent the FCC from conducting any such reexamination in the future. The rider even identifies by docket number

---

[11] The FCC's rulemaking followed a request by the FCC to the D.C. Circuit — before which a constitutional challenge to the FCC's comparative licensing gender preference policy was pending -- to permit the agency to reexamine its preferences. *See Race and Gender Preferences*, 1 F.C.C. Rcd 1315 (1986)
Continued

(MM Docket No. 86-484) and, almost verbatim, the title of the specific FCC rulemaking (or "reexamination") with which it was concerned.[12]

The structure of the 1990 Appropriations Act also supports the conclusion that Congress did not intend the rider as a restriction on the use of all funds appropriated in the 1990 Appropriations Act. If Congress intended to apply the rider's restrictions to all of the federal entities, presumably it would have inserted language of restriction in the respective titles—each of which includes other restraints on the use of the appropriated monies—or, more likely, in title VI, a catch-all section that includes provisions limiting the use of funds appropriated in *any* of the earlier titles. Neither titles I-IV nor title VI contains any restriction substantively similar to that in the rider.

Even assuming that the rider extends to the funds appropriated to the Department of Justice, we do not believe that filing an amicus brief would be prohibited. The rider only prohibits the expenditure of funds "to repeal, to retroactively apply changes in, or to continue a reexamination of" the specified FCC policies. The Department of Justice does not even have the power to "repeal" or to "apply changes in" an FCC policy. That administrative power rests in the FCC and, through legislation, Congress.

Nor, we think, can the filing of an amicus (or any other) brief be regarded as "continu[ing] a reexamination" of the FCC policies at issue.[13] First, read in the context of the immediately preceding proscriptions on "repeal" and "changes in" the FCC policies, the term "continu[ing] a reexamination" is

---

[11] (...continued)

(MM Docket No: 86-484), *modified*, 2 F.C.C. Rcd 2377 (1987). The FCC had sought this reexamination in part because of its opinion at that time that both the racial and the gender preferences were unconstitutional. *See Brief for the Federal Communications Commission on Rehearing En Banc in Steele v. FCC*, D.C. Cir. No. 84-1176. The FCC was engaged in preparing findings in the rulemaking when Congress decided to abort the proceedings. In obedience to Congress' directive, the FCC closed the rulemaking and reinstituted the preferences on January 14, 1988. *See* FCC 88-17.

[12] There is no suggestion in either the text or legislative history of the subsequently-enacted riders that Congress' purposes for including the rider in the FCC appropriation has changed since the rider was first enacted in 1987. *See* S. Rep. No. 144, 101st Cong., 1st Sess. 86 (1989) (Committee "recommends retention" of provisos enacted previously); S. Rep. No. 388, 100th Cong., 2d Sess. 79 (1988) (Committee has "continued language from previous appropriations acts with regard to . . . minority and women ownership of broadcasting licenses").

[13] Arguably, no expenditure made after closure of the rulemaking proceeding in MM Docket No. 86-484 by any of the federal entities for which appropriations were made in the 1990 Appropriation Act could run afoul of this portion of the rider's prohibition. The rider could fairly be interpreted to prohibit only the expenditure of funds to continue the particular "reexamination" of the FCC policies then in progress in MM Docket No. 86-484, which was closed on January 14, 1988. *See, e.g.*, S. Rep. No. 182 at 76 (rider inserted to prohibit expenditures to "continue a *pending* reexamination" of the FCC policies (emphasis added)). If the rider were so interpreted, it would not prohibit a new "reexamination" of the policies.

Congress clearly understood and appreciated the difference between *beginning* a reexamination and *continuing* a reexamination of a particular matter, as evidenced by its prohibition in the same appropriations act of expenditures "to repeal, to retroactively apply changes, or *to begin or continue a reexamination* of the rules and policies established to administer such rules of the Federal Communications Commission as set forth at section 73.3555(c) of title 47 of the Code of Federal Regulations." *See* 103 Stat at 1021 (emphasis added).

best understood to refer only to administrative reexamination of the policies.[14] A court does not examine policies *qua* policies; it reviews the legality of the policies. Thus, while the prohibition might prevent commencement of a new *administrative* inquiry into the wisdom (or even the legality) of the agency's racial and gender preference policies, we do not believe it would stand as a bar to a *legal* challenge to those policies before the courts of law.[15]

Second, even if the rider were interpreted to extend to challenges in a judicial forum, we do not believe that the filing of a brief once the Court has decided to hear a challenge entails the use of funds *"to* continue a reexamination" of the FCC policies. The Court perhaps expended funds to continue the reexamination by docketing the cases, and will continue to do so by retaining the case on its docket for briefing, argument and disposition. With certiorari granted, however, the Department would only be expending funds *to participate* in a "reexamination" that has already been continued; it would not be expending funds "to" continue a reexamination. The reexamination, if that it be, *see* discussion *infra*, is underway and will continue, whether or not the Department participates. The Department fully complied with the terms of the prohibition (assuming that it applies) by opposing the grant of certiorari.

Finally, the Supreme Court's review of these cases would not properly be considered a *"re*examination" of the FCC policies because the Court has never previously examined these policies. One could argue that *any* second and successive examination constitutes a "reexamination" because the FCC has already once examined them. We believe, however, that the better reading of the rider (regardless to whom it applies) is as a prohibition on a second and successive examination by the same entity. This especially would seem to be the better interpretation, given that the prohibition is against "continuing" a reexamination, not merely reexamining, the specified policies. One does not ordinarily think of a second body "continuing" a reexamination begun by another body. Of course, this interpretation finds substantial support in the legislative history. *See* discussion *supra* at 16.

For the aforementioned reasons, we believe it is clear that Congress did not intend the rider to serve as a limitation on Department of Justice expenditures. Even if Congress' intent were less than clear, however, we would

---

[14] In the Senate Report accompanying the first appropriations bill to which the rider was attached, the Committee instructed the FCC to resolve certain pending cases in a manner consistent with the FCC's racial and gender preference policies. S. Rep. No. 182 at 77. The Committee's instruction identifies the cases to which it refers as ones which had been either remanded to the FCC by the District of Columbia Circuit Court of Appeals, or held in abeyance by the FCC pending reexamination of its policies. The Committee thus merely instructed the FCC to apply the racial and gender preference policies in administrative adjudication, which is consistent with our view that the rider was directed only at administrative actions that might lead to reversal of the specified FCC policies.

[15] Indeed, if the prohibited "reexamination" of FCC's policies bars a Justice Department legal challenge to those policies, it would also preclude judicial review of those policies, since the federal judiciary is funded by title IV of the Act, and would be subject to the same restrictions in the rider. Apart from the serious constitutional issue that would be presented by a provision purporting to prevent constitutional challenges to a law, *see, e.g., Webster v. Doe*, 486 U.S. 592, 603 (1988), it would be extraordinary to construe a provision to prevent judicial review sub silentio.

18

interpret the rider to permit an amicus filing so as to avoid the serious constitutional problems, *see NLRB v. Catholic Bishop,* 440 U.S. 490 (1979), that would otherwise exist. A statute that purported to prohibit the Executive from filing an amicus or other brief on the constitutionality of federal agency action or policy would raise the most serious constitutional concerns.[16]

The President is constitutionally required to take care that the laws, including the Constitution, be faithfully executed. *See* U.S. Const. art. II, § 3. Before entering office, the Constitution requires that he "solemnly swear" that he will "to the best of [his] Ability, preserve, protect and defend the Constitution of the United States." *Id.* art. II, § 1, cl. 8. The filing of briefs in courts of law through his subordinates—particularly as such filings may bear on the legality of action taken by Executive departments or agencies— is integral to the discharge of his constitutional duty to see that the laws are faithfully executed. As a consequence, while the question never has been and may never be litigated, it is doubtful that Congress, through exercise of its appropriations power or otherwise, could ever prevent the Executive from advancing before the courts a particular view of the constitutionality of an Executive agency action or policy.

## CONCLUSION

For the foregoing reasons, we conclude that the 1990 Appropriations Act does not bar the Department of Justice from filing an amicus brief with the Supreme Court in the *Metro Broadcasting* litigation.

J. MICHAEL LUTTIG
*Principal Deputy*
*Assistant Attorney General*
*Office of Legal Counsel*

---

[16] Interpreting the rider so that it would extend to the Department of Justice would result in its application to the judiciary, as well. Application of the rider to prohibit the judiciary from expending any of its appropriated funds "to continue a reexamination" of the FCC policies would raise separate, but equally serious, constitutional questions.

19